IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

BRANDON A.,[1]                            )
      Plaintiff,                      )        Civil Action No. 5:21-cv-00059
                                          )
v.                                        )        REPORT & RECOMMENDATION
                                          )
KILOLO KIJAKAZI,                          )        By:   Joel C. Hoppe
Acting Commissioner of Social Security,   )              United States Magistrate Judge
      Defendant.                      )

Plaintiff Brandon A. asks this Court to review the Acting Commissioner of Social

Security's ("Commissioner") final decision denying his application for disability insurance

benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. The case is

before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative

record, the parties' briefs, and the applicable law, I cannot find that the Commissioner's denial of

benefits is supported by substantial evidence.[2] Accordingly, I respectfully recommend that the

presiding District Judge reverse the decision and remand the matter under the fourth sentence of

42 U.S.C. § 405(g).

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

*also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

[2] I decline Brandon's request for oral argument, Pl.'s Br. 18, ECF No. 16, because the facts and legal
positions are adequately presented in the materials before the court and a hearing would not aid the
decisional process. *See* Fed. R. Civ. P. 78(b); W.D. Va. Gen. R. 4(c)(2). The Commissioner did not
request oral argument.

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether

substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th

Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v.*

*Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is

"more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount

of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review

considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera*

*Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir.

1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence

allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434

F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not

binding if it was reached by means of an improper standard or misapplication of the law."

*Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in

"any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20

C.F.R. § 404.1505(a).[3] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Brandon applied for DIB in late December 2019. *See* Administrative Record ("R.") 171–72. He alleged that he became disabled on September 15, 2019, because of depression, PTSD, anxiety, and seizures. R. 184. Brandon was thirty-four years old, or a "younger person" under the regulations on his alleged onset date. R. 65; 20 C.F.R. § 404.1563(c). Disability Determination Services ("DDS"), the state agency, denied Brandon's claim initially in March 2020, R. 63–75, and upon reconsideration that June, R. 76–87. In January 2021, Brandon appeared with counsel and testified by telephone at an administrative hearing before ALJ H. Munday. R. 31–62. Brandon's wife, Betty Jo, and a vocational expert ("VE") also testified by phone. R. 52–56, 57–61. ALJ Munday issued an unfavorable decision on February 17, 2021. R. 12–26.

ALJ Munday found that Brandon had the following "severe" medically determinable impairments ("MDI") during the relevant period: depression, anxiety, and post-traumatic stress disorder. R. 14. She also found that Brandon's seizure disorder was a non-severe MDI because it

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

was well controlled by medication. R. 15. None of Brandon's severe MDIs met or medically

equaled the relevant Listings. *Id.* (citing 20 C.F.R. pt. 404, subpt. P. app. 1 §§ 12.04, 12.06,

12.15). As part of her Listings analysis, ALJ Munday found that Brandon's severe depression,

anxiety, and PTSD caused "moderate" overall limitations in understanding, remembering, or

applying information; interacting with others; and adapting or managing himself; and a "mild"

overall limitation in concentrating, persisting, or maintaining pace. R. 15–16 (citing R. 197–204,

385–86, 418, 430, 457, 564).

ALJ Munday then evaluated Brandon's residual functional capacity ("RFC") and found

that he could work at all exertional levels, but had the following nonexertional limitations:

> no climbing ladders, ropes, or scaffolds; no exposure to hazardous conditions,
> including unprotected heights and moving machinery; able to perform simple,
> routine tasks; occasional interaction with co-workers; no interaction with general
> public; and able to work in a "low stress" environment, which is defined as
> occasional independent decision making and occasional workplace changes.

R. 17. This RFC ruled out Brandon returning to his past relevant work as a warehouse worker

and stock clerk. R. 25 (citing R. 57–58). Relying on the VE's testimony, however, ALJ Munday

found that this RFC would have allowed Brandon to do certain medium "unskilled" occupations

(cleaner, laundry worker, equipment cleaner) that offered a significant number of jobs in the

national economy. R. 26 (citing R. 58–59). Thus, ALJ Munday concluded that Brandon was not

disabled between September 15, 2019, and February 17, 2021. R. 26. The Appeals Council

declined to review that decision, R. 1–4, and this appeal followed.

### III. Discussion

Brandon challenges the Commissioner's denial of benefits on two independent grounds.

*See* Pl.'s Br. 8–11, 12–16, 17. First, Brandon argues that the ALJ erred in failing to properly

analyze medical-opinion evidence from two of Brandon's providers, John Carter, PA-C, and

James Phil Harmon, LPC. *See id.* at 8. Second, Brandon argues that ALJ Munday did not

properly analyze Brandon's and his wife's subjective statements describing his essentially disabling symptoms and functional limitations from anxiety, PTSD, and depression. *Id.* at 12–16. Brandon also asserts that, but for either of those two legal errors, ALJ Munday "would have concluded" either that Brandon "would be off-task 15% or more" of the workday, or that he "would miss at least two days of work a month." *Id.* at 17. The VE testified that an RFC with either of those restrictions would "eliminate all competitive employment" in the economy. *Id.* (citing R. 59).

A.    *Summary*

    1.    *Treatment Records*

Brandon's medical records depict a long history of depression and anxiety. *See, e.g.*, R. 385. In April 2013, Brandon reported that he had started treatment for depression when he was sixteen years old. *Id.* He had tried electroconvulsive therapy ("ECT"), outpatient counseling, Effexor, Prozac, Pristiq, Celexa, Wellbutrin, Zoloft, and Xanax. *See id.* His "best response" was to Effexor, but the other treatments were not "particularly helpful." *Id.* Around age nineteen, Brandon "was able to ween [him]self off Effexor" and "[d]id well" managing his symptoms without treatment for many years. *See id.* By April 2013, however, he felt "depressed" and found "it hard to be around people." *Id.* He did not have panic attacks anymore, but he thought "about everything all the time and gets anxious." *Id.* (Apr. 30, 2013); *accord* R. 388 (copy). In May 2017, Brandon and his young son were "in a rough[] car accident" where Brandon "suffered some internal injuries," R. 374; *see* R. 44, including aortic dissection, R. 260, and concussion, R. 327.

On August 20, 2018, Brandon had a seizure while operating a standing forklift at work. R. 44, 266. He fell from the forklift and hit his head on the floor, R. 44, causing him to lose

consciousness, R. 266. Brandon reportedly was "sluggish and appeared postictal for several minutes after the episode," but he was "fully awake and alert and was able to respond to questions and commands appropriately" when the rescue squad arrived and took him to the emergency department ("ED") at Augusta Health. R. 267. In the ED, Brandon reported two "discrete seizure episodes in the past." R. 266. After his most recent seizure, which was five years earlier, he was placed on a six-month course of seizure prophylaxis (gabapentin). R. 266. He had been seizure-free without medication since that time. *Id.* The attending physician told Brandon that it would be "a good idea to restart seizure prophylaxis" and gave him a prescription for twice-daily Keppra until Brandon could follow up with his neurologist. R. 270. He also gave Brandon a "work excuse" form, R. 283, and explained that he "cannot drive for 6 months or until cleared by neurology," R. 270.

On September 24, Brandon told Courtney Wilson, NP-C, that he "sustained [a] traumatic head injury during [the] seizure and ha[d] been experiencing dizziness" with position changes and head movement ever since. R. 362. He also reported feeling "intermittently depressed over the last month," even "becom[ing] randomly tearful," and he wanted to restart Wellbutrin. *Id.* Nurse Wilson noted that Brandon's mood, affect, speech, behavior, thought content, cognition, and memory were all "normal" on that day's exam, but he was "tearful at times." R. 363. She restarted Brandon on 150 mg Wellbutrin and gave him "a work note . . . to extend [his] FMLA" leave. *Id.* Brandon saw neurologist Zsofia Hole, M.D., in late October 2018. R. 327. He reported depression and anxiety, R. 327, and he appeared anxious on exam, R. 329. Dr. Hole suggested that Brandon consider something besides Wellbutrin to manage his depression, since that drug "can lower [one's] seizure threshold." R. 329. She also reiterated that Brandon could not drive for six months after August 20, 2018, the date of his last seizure activity. *Id.*

6

On January 5, 2019, Brandon went to the ED at Augusta Health because he felt confused, anxious, and nauseous while at work. R. 304. Brandon explained that he was at home with his wife on the prior evening when "he developed a cloudy head and felt disoriented, and with this he became worried that he was going to have a seizure." *Id.* Those sensations caused him to "develop chest tightness," which continued intermittently throughout the day. *Id.* Brandon had "felt this similar sensation with his anxiety and panic attacks before." *Id.* He "recently stopped taking [his] depression medication." *Id.* Brandon appeared "anxious," but was cooperative and pleasant on exam. R. 305. The attending physician noted that Brandon's neurological exam was "completely unremarkable, and it [did] not sound like he had a seizure last evening" or that he was "getting ready to have a seizure today." R. 306.He sent Brandon home with a "small script for Ativan and Zofran to use as needed for anxiety attacks and nausea" until he could follow up with his neurologist and primary-care provider within the next week. *Id.*

On January 7, Brandon called Dr. Hole's office to ask if he could see her sooner than his scheduled follow-up appointment. R. 326; *see* R. 329. He reported feeling "'disoriented' and ha[d] an 'odd feeling' in his head" over the past few days. *Id.* Brandon was able to get an appointment with Dr. Hole for January 18. In the interim, he returned to Nurse Wilson at Staunton Family Medicine. R. 353–55 (Jan. 10, 2019). Brandon was "still having major anxiety and intermittent episodes of cloudiness and disorientation," as well as "intermittent nausea." R. 354. He was "anxious" and "tearful at times" during this visit, but his mental status exam was otherwise normal. R. 355. Nurse Wilson prescribed 20 mg Prozac daily, R. 355, and referred Brandon to "psychiatry for anxiety, depression, and panic," R. 353. She also gave him a "work note," indicating that he "may not return to work until cleared by [n]eurology." R. 355.

When Brandon saw Dr. Hole on January 18, 2019, he reported "current issues" with

"'some memory loss' [where] he repeats conversations. Some days he doesn't remember going

places" and "[s]ometimes" he feels "disoriented," like he "doesn't realize what's is going on

around him" or "like things [aren't] real." R. 325. "These symptoms started a long time ago but

ha[d] gotten worse." *Id.* Switching from Wellbutrin to Prozac made Brandon feel "funny, just

sort of antsy, [and] jittery." *Id.* He was "tired all the time" and his "mood [had] been 'down a

lot.'" *Id.* Brandon was still on FMLA leave from work. *Id.* His neurologic exam was normal that

day. R. 326. Dr. Hole thought it was "unlikely" that Brandon's reportedly worsening "symptoms

including memory loss, disorientation, and anxiety" were signs of "subclinical seizures," but she

ordered a 24-hour electroencephalogram ("EEG") just to make sure. *Id.* She also wanted to refer

Brandon "for neuropsychological testing" because she thought his "anxiety/depression may be

playing a large role in his symptoms." *Id.* The EEG results were normal. R. 330–31 (Feb. 11,

2019). Dr. Hole's later progress notes indicate that Brandon's "neuropsychological testing

revealed evidence of depression, generalized anxiety disorder, interpersonal withdrawal/isolation

and numerous antisocial personality characteristics."[4] R. 322 (July 17, 2019); *see also* R. 375

("We went over his neuropsych[] testing results from Dr. Showalter and he feels continued

treatment with antidepressants and management of his psychotic features which include VH

[visual hallucinations] (shadows and blurred movement) as well as an increase in

hyperreligiosity.") (May 1, 2019).

On January 29, Brandon established care with Timothy Kane, M.D., and John Carter,

PA-C, at Comprehensive Behavioral Health ("CBH"), to manage his worsening depression and

anxiety. R. 385. Brandon explained that he "had a couple of rough years" after his car accident

---

[4] The actual test results are not in the record.

and falling from the forklift. *Id.* He felt "really disconnected from everything," R. 385–86, and "socially withdrawn," R. 386. Brandon endorsed a persistently "depressed mood"; hypersomnia; "decreased" attention and impaired memory; "worsening" irritability, specifically noting that he "angers quickly and easily"; "poor" energy/motivation; and "increased anxiety" with "daily panic attacks" of varying intensity that caused "chest tightening, [dyspnea,] diaphoresis, and shakiness[.]" R. 386. He was still taking 20 mg Prozac every day. *Id.* PA Carter observed that Brandon's mental status was generally normal except for his "restricted [affect] range." *Id.* (noting "appropriate" attention to grooming, "normal" speech with "appropriate spontaneity," "logical and linear" thought process, and "intact" judgment and associations). Acting under Dr. Kane's supervision, *see* R. 385, PA Carter doubled Brandon's daily dose of Prozac and added 25 mg Vistaril (hydroxyzine hydrochloride) as needed for anxiety. R. 387.

On March 18, Brandon established care with J. Phil Harmon, LPC, a therapist at Augusta Behavioral Health. R. 456. He described his mood as "up and down" and endorsed increased anxiety, "crying spells," decreased concentration, and "some" hopelessness. R. 457. Mr. Harmon's findings on that day's mental-status exam were normal. *Id.* Brandon saw Mr. Harmon for counseling about once a week through May 2020. *See* R. 455, 458–508. Most of Mr. Harmon's handwritten notes from theses sessions are illegible. *See* R. 458–508. Nonetheless, he consistently noted that Brandon endorsed "anxiety," R. 459–61, 465–71, 473, 474–75, 480, 482–88, 492–501, 506, as well as occasional sleep disturbance, irritability, or social isolation, R. 459–60, 473, 475, 486, 488, 496, 499, 505.

Brandon followed up at Staunton Family Medicine on March 28, 2019. R. 346. The FMLA leave forms that Nurse Wilson completed in January stated that he could return to work on April 1, but Brandon was scheduled to undergo a sleep study and neuropsychological testing

that week. *Id.* He continued to endorse depression, anxiety, nervousness, daytime fatigue, and

memory loss. R. 346–47. Brandon appeared "anxious" and exhibited "impaired" cognition and

memory on that day's exam. R. 347. He did not exhibit a depressed mood. *Id.* The provider

agreed to "update FMLA [leave] to cover through" April 18, 2019. R. 348.

Brandon saw PA Carter again on April 5. R. 382–83. He had "not been doing well." R.

382. Brandon described financial stressors he was facing at the time, which resulted in increased

stress. *Id.* He had also "been off of his medications for" about ten days, even though he "had

been taking his medication with no concerns or adverse side effects and had been experiencing

positive results." *Id.* Brandon felt "exceptionally depressed since going off of his meds[.]" *Id.* He

restarted the 40 mg Prozac around April 1 and was "starting to feel better." *Id.* But Brandon still

felt "very manic off of his medications," so PA Carter and Dr. Kane prescribed one week's worth

of Zyprexa to "help him sleep and stabilize his mood." *Id.* Brandon also endorsed "depressed,

anxious, and irritable" mood, decreased attention, low frustration tolerance, "fair" energy and

motivation, social isolation, and "passive" suicidal ideation, but no plan. R. 382–83. He

described his anxiety as "improving, intermittent," but noted that he still felt "anxious most all

day." R. 382. PA Carter's findings on Brandon's mental-status exam were the same as his initial

visit. R. 382–83; *see* R. 386 (Jan. 2019).

Two weeks later, Brandon told PA Carter that he was "not doing very well since his last

visit." R. 379 (Apr. 17, 2019). He felt "exceptional" stress and did not know what to do anymore.

Brandon said that the 40 mg Prozac improved his mood swings; he had not taken the Zyprexa

because it made him extremely drowsy during the day. *See id.* He now reported "daily panic

attacks" and "poor" motivation/energy, but he was "socializing appropriately." *Id.* Brandon

asked PA Carter if he would write "a return to work letter with the accommodations of only

working 6 hour shifts." *Id.* PA Carter agreed, but he cautioned that Brandon's "employer may

not be willing to grant this accommodation and he could end up being fired as a result." *Id.* PA

Carter's findings on mental-status exam were unchanged. R. 379–80. Acting under Dr. Kane's

supervision, R. 378, PA Carter prescribed Ativan as needed for anxiety, R. 380, and started

Brandon on "a trial of Abilify 5mg [daily] to help better manage his symptoms," R. 379. They

discontinued Abilify before month's end. *See* R. 459 ("Trial Abilify [illegible] d/c.") (Apr. 30,

2019); R. 375 ("He has had difficulties with adjunctive medications in the past including Abilify

and Zyprexa.") (May 1, 2019).

On April 30, Brandon told Mr. Harmon that he tried to go back to work for the first time

since January 2019. R. 459; *see* R. 346, 458. He was "sent home" to do "flex work" on the first

day and "worked 6 hrs on restricted" duty the second day. R. 459. On the third day, his employer

"called and told [him they] would not work with him." *Id.* Brandon told PA Carter something

similar when he went to CBH for a follow-up appointment the next day. R. 375 ("He discussed

the possibility of accommodations with his employer to facilitate a gradual transition back into

his work, but he was denied."). He also asked if CBH would "take over his short term disability

request" given that Nurse Wilson had left Staunton Family Medicine. *Id.* Brandon explained that

"increased stress, debilitating anxiety with daily panic attacks, and memory loss . . . would make

it difficult for him to perform his duties" at the level his employer expected. *Id.* PA Carter

"recommend[ed] an extension of [Brandon's] short term disability while [they] continue[d] to

manage his medications to return [him] back to his baseline." *Id.* At this visit, Brandon described

his mood as "depressed and anxious," his motivation/energy as "fair," and his chronic anxiety as

"worsening." *Id.* He also endorsed "isolating behaviors," "delusions and hallucinations," and

"persistent suicidality[,] but [he] deni[ed] any plan or intent." *Id.* PA Carter's findings on that

day's mental-status exam were the same as at prior visits. R. 376; *see* R. 379–80, 382–83, 386.

With Dr. Kane's approval, R. 374, PA Carter refilled Brandon's Ativan, increased his Prozac to

60mg daily, and added 2mg Rexulti once a day "to help bolster his antidepressant and help

suppress his positive symptoms." *See* R. 375–76.

Brandon continued to report anxiety, memory loss, and/or sleep disturbance (nightmares)

at office visits throughout the spring and summer of 2019. *See, e.g.*, R. 460–74 (May 8–Sept. 4);

R. 555 (July 17). On September 25, Brandon told Mr. Harmon that he experienced anxiety, panic

attacks, social isolation, irritability, memory loss, poor concentration, crying spells, sleep

disturbance, irritability, and anger/outbursts. R. 475. Two days later, Mr. Harmon completed an

"Attending Provider Statement" noting that Brandon's ongoing PTSD symptoms required him to

take a "medically necessary" leave of absence from work. R. 476. He opined that Brandon was

"totally unable to work" for the next thirty days, but that he should be able to resume "full time,

duty work" on October 24, 2019. *Id.* Mr. Harmon's notes indicate that Brandon reported having

"visual disturbances" and "flashbacks to injuries and [illegible] at work," R. 477 (Oct. 2), as well

as ongoing anxiety, "occasional hopelessness," and "reported memory and concentration issues,"

R. 479–80 (Oct. 7). Mr. Harmon completed two more Attending Provider Statements on October

17 and December 10, 2019. R. 481, 489–91. Both state that Brandon's ongoing PTSD symptoms

(anxiety, flashbacks, irritability) required him to continue on a "medically necessary" leave of

absence and that he had been "totally unable to work" since late September 2019. R. 481, 489,

491. Mr. Harmon's notes indicate that Brandon consistently reported ongoing anxiety, R. 482–

93, as well as occasional crying spells, R. 493 (Dec. 18); ruminative thinking or excessive worry,

*see* R. 483 (Oct. 30), 486 (Nov. 13), 493 (Dec. 18); sleep disturbance, R. 486 (Nov. 20), 488

(Dec. 4); and hopelessness or helplessness, R. 487 (Nov. 25), 488 (Dec. 4).

Brandon returned to Staunton Family Medicine on October 7, 2019, with worsening depression. R. 340–42. He had "been without Prozac for the past 10 days or so," but he noted getting "good benefit from [that] SSRI." R. 340. On exam, the provider noted Brandon exhibited an "anxious" and "depressed mood," but he was fully oriented and had normal thought content with no expressed suicidal ideation. R. 342. The provider increased Brandon's Prozac to 60mg daily, *id.*; *but see* R. 375–76 (PA Carter prescribing the same on May 1), and encouraged him to keep working with Mr. Harmon, R. 342. At his next visit on November 26, Brandon told the provider that he felt "empty." R. 337. He had "been dealing with his depression for a long time. . . and [was] just getting tired of it." *Id.* Brandon did not plan to hurt himself, but he thought about it a lot and he recently dreamt that he drowned himself. *Id.* Brandon's father accompanied him to this appointment. He did not feel like Brandon was suicidal, but he worried about Brandon's ruminative negative thinking and his inability to think about good things. R. 337–38. Brandon was anxious, "tearful," and "trembling during [the] exam." R. 339. After a lengthy discussion, everyone agreed "it would be in [Brandon's] best interest" if he went straight to the emergency room to be "evaluated to see if inpatient [treatment was] warranted." R. 340. Brandon's father agreed to drive him there, and Brandon was "okay with this approach." *Id.* The record does not contain any ED or hospital records created on or around November 26, 2019.

Later that day, Brandon and his father saw Stephanie Bruton, PA-C, for a follow-up visit at CBH. *See* R. 388–91. Brandon was "tolerating Prozac well," but he reported continued "high anxiety especially when he is in a car [because] it reminds him of his car accident" in May 2017. R. 389. He also reported "depressed, anxious, irritable" mood; persistent all-day anxiety, but "no panic attacks"; "difficulty maintaining sleep"; "poor" energy/motivation; and passive suicidal ideation with no plan. R. 389. PA Bruton's findings on a comprehensive mental-status exam

were essentially normal, including "adequate concentration," "coherent, logical" thought process, and "appropriate" mood, affect, judgment, insight, speech, and grooming. R. 390. She increased Brandon's Prozac to 80mg daily and added twice-daily Klonopin for anxiety. R. 391; *see* R. 427.

Brandon saw PA Carter again on December 16, 2019. R. 427–33. He took Prozac 80 mg daily, but he was "still struggling with mild visual hallucinations." R. 427. Brandon reported that his "depressive symptoms [were] still consistently severe" and he experienced "continuous suicidal ideation without plan or true intent." *Id.* His sleep was "within normal limits" now, but he still was "anxious most all day," angered "quickly and easily," engaged in "isolating behaviors," and generally felt irritable, "depressed, anxious, sad, [and] tearful." *Id.*; *see also* R. 432 (reporting similar symptoms "nearly every day" in the past two weeks plus trouble concentrating on tasks "more than half the days" in the past two weeks). These near-daily symptoms had made it "extremely difficult" for Brandon to "take care of things at home[] or get along with other people." R. 432. PA Carter noted that Brandon had "depressed, anxious, sad, [and] tearful" mood with labile affect on that day's mental-status exam. R. 430. Other findings were unremarkable. *Id.* (noting "well-groomed" appearance, "direct" eye contract, normal speech and psychomotor behavior, "cooperative" and "appropriate" attitude, and "intact" reasoning, associations, and concertation). PA Carter noted they "would transition Brandon from the Prozac to [10 mg] Trintellix," and would also try adding Vraylar 1.5 mg once a day "as an adjunct antidepressant." R. 427. He also thought Brandon "would be an ideal candidate" for Spravato therapy because, considering Brandon's "multiple medication failures" and failed ECT years earlier, he "certainly [met] criteria for a treatment resistant depression."[5] *Id.* He gave Brandon

---

[5] In March 2019, the U.S. Food & Drug Administration "approved Spravato (esketamine) nasal spray, in conjunction with an oral antidepressant, for the treatment of depression in adults who have tried other

prescriptions for the new drugs and said CBH would forward the Spravato request to Brandon's health insurance carrier. R. 428. On December 30, Brandon told PA Carter that the new Vraylar had "significantly reduced" his hallucinations. R. 421. But, "there ha[d] not been any significant improvement in his mood," R. 421, over the past two weeks. *See also* R. 421, 426 (reporting the same symptoms as prior visit). PA Carter's findings on that day's mental-status exam were the same as at the previous visit. R. 424; *see* R. 430. He doubled Brandon's daily dose of Vraylar (3 mg) and refilled his other medications. R. 425.

On January 14, 2020, Brandon told PA Carter that he had "been doing okay since [their] last visit" and even "experienced a few days where he was feeling exceptionally well." R. 392. But those good feelings would "resolve and he [would] return to his baseline symptoms of suicidality and depression." *Id.* Brandon also noticed he had been more irritable and "volatile" lately, "usually surrounding small things." *Id.* He endorsed the same persistent depressive and anxiety symptoms as at his visit two weeks earlier. R. 392, 397; *see* R. 421, 426. PA Carter's exam findings were essentially unchanged, except he noted Brandon's mood was now "irritable" in addition to its preexisting "depressed, anxious, sad, [and] tearful" state. R. 394–95. He refilled Brandon's oral medications (Prozac, Klonopin, Trintellix, Vraylar) and noted they would start the authorization process for Spravato. *See id.* On January 28, Brandon "continue[d] to report occasional periods of feeling good (hours at a time) maybe once or twice per week." R. 404.

---

antidepressant medicines but have not benefited from them (treatment-resistant depression). Because of the risk of serious adverse outcomes resulting from sedation and disassociation caused by Spravato administration, and the potential for abuse and misuse of the drug," it must be administered "under the supervision of a health care provider in a certified doctor's office or clinic, and the spray cannot be taken home." *FDA Approves New Nasal Spray Medication for Treatment-Resistant Depression; Available only at a Certified Doctor's Office or Clinic*, U.S. Food & Drug Admin. (Mar. 5, 2019), https://www.fda.gov/news-events/press-announcements/fda-approves-new-nasal-spray-medication-treatment-resistant-depression-available-only-certified. "[P]atients must be monitored by a health care provider" in the health care setting "for at least two hours after receiving their Spravato dose" and they "should not drive or use heavy machinery for the rest of the day on which they received the drug." *Id.*

Once those good feeling resolved, however, he felt "an increase in his irritability and emotionality that [was] worse than prior to these 'up' periods." *Id.* "[H]e will break down and cry for no reason whatsoever." *Id.* Brandon's "anxiety [was] significantly increased especially when around large groups of people." *Id.* He was tolerating his medications well, but he had recently noticed "an inability to sit still while at home." *Id.* PA Carter noted "[t]his may be the signs of akathisia due to his antipsychotic medication." *Id.* He doubled Brandon's daily dose of Trintellix (20 mg) and added 10mg propranolol twice daily "to help with both his symptoms of akathisia and his social anxiety." *Id.* PA Carter also extended Brandon's FMLA leave for another month. R. 409.

On February 11, Brandon told PA Carter he had "not noticed any significant response to his current medication regimen," R. 410, which at the time included 80 mg Prozac daily, 20 mg Trintellix daily, 3 mg Vraylar daily, 10 mg Propranolol twice daily, and 0.5 mg Klonopin twice daily, R. 413. He also reported "breakthrough visual hallucinations" on Vraylar, R. 410, which prompted PA Carter to substitute 5 mg Saphris for that antipsychotic, R. 414. Two weeks later, Brandon reported the Saphris made him feel "overwhelmingly groggy." R. 415. He took it for ten days and then stopped. *Id.* Brandon felt that 3 mg Vraylar was "more helpful in managing his depression and suicidality," even if it did not fully control his hallucinations. *Id.* PA Carter restarted Brandon on Vraylar at a slightly higher dose (4.5 mg) than before. Brandon's thoughts of suicide were "not as frequent or severe" as at his last visit, but his other persistent depressive and anxiety symptoms were the same, R. 415, or "worse," R. 419. PA Carter's findings on exam were the same as at Brandon's three most recent visits. R. 418; *see* R. 394–95, 407, 413.

At his next visit to CBH on March 11, 2020, Brandon reported that the Vraylar 4.5 mg "helped with his mood slightly" and he was "feeling better than he ha[d] in some time." R. 446.

He still had "persistent passive suicidality," but he reported "a decrease in frequency and severity." *Id.* PA Carter noted they would "continue his current medication regime and work towards getting him started on a trial of Spravato," but there was "still [a] very long" wait for that drug. R. 449. Brandon spoke to Mr. Harmon on the phone a few times in April and May 2020. *See* R. 504–08, 561. He consistently endorsed anxiety and excessive worry. *See* R. 504–08. In late May, Brandon told Dr. Hole that he "continue[d] to have a lot of issues with depression and social anxiety." R. 553.

On July 21, 2020, Brandon told PA Carter that he had "been struggling somewhat" since his last visit in early March. R. 561. Brandon stopped taking all his medications about two months earlier because he thought they were "ineffective." R. 561–62. He denied "significant suicidality," but endorsed "worsening anxiety and fear." R. 561 ("Says that he is terrified most days."). The presence of COVID-19, as well as his parents' belief that the pandemic was not "real," had "caused a significant amount of racing thoughts" and additional stress in his life. *Id.* He explained that he returned to CBH for evaluation and medication management "after an episode the other night where he became panicked through the night and felt as though he was dying." *Id.* Brandon also admitted to "worsening disassociation" from reality and feeling "as though he is living in a simulation." R. 565; *accord* R. 561 ("He says that he still experiences periods where he feels as though the things that he is experiencing in this life are not real. He feels disconnected from reality."). PA Carter noted that Brandon exhibited "depressed, anxious, sad, tearful, [and] irritable" mood with "labile" affect on that day's exam, R. 564, but his other findings were normal, R. 564–65 (noting "direct" eye contact, "normal" speech, "cooperative" attitude, "normal" judgment, and "intact" attention, concentration, and associations with "no overt signs during interview of response to hallucinations [or] paranoia"). He restarted Brandon

17

on Prozac and Trintellix and added Risperidone 1mg daily and Ativan 0.5 mg as needed for
"panic." R. 566.

Three weeks later, Brandon told PA Carter he had "been struggling since [his] last visit."
R. 567. He was "experiencing daily panic attacks that [were] not managed by the Ativan 0.5
mg," and he could not identify "any triggers that might be contributing" either to those
"worsening" panic attacks or to the "significant decline in his mood." *Id.* He continued to
endorse "isolating behaviors," irritability, anxiety, and "poor" motivation/energy. *Id.* PA Carter
noted that Brandon was "tearful and overwhelmed by his presentation" and that "the instability
[he] exhibited during this appointment [was] difficult to ignore." *Id.* He stopped the Risperidone,
refilled Brandon's other medications, and "increased his Ativan to 1 mg twice daily . . . to see if
[they could] get his worsening panic under better control." R. 571. PA Carter also opined that,
"given [Brandon's] significant and worsening symptoms of depression, along with his poor
response to multiple medication interventions with limited success," he believed they were
"struggling with a treatment resistant depression." *Id.* Brandon could not "undergo Transcranial
Magnetic Stimulation given his known seizure disorder," so PA Carter again recommended that
he "undergo Sprava[t]o therapy." *Id.* Brandon also was not working, so they "would not have to
worry about him missing work for this treatment as the time commitments are significant,
especially early on in the treatment." *Id.* PA Carter noted that CBH would submit this request to
Brandon's insurance "to see if he is approved." *Id.* There are no more progress notes from CBH
in the record.

Progress notes from Staunton Family Medicine dated October 9, 2020, indicate that
Brandon was receiving Spravato nasal spray once every 14 days. R. 602. He reported his "mood
[had] been doing much better" than in November 2019 and that "Spravato ha[d] helped greatly."

*Id.* Nonetheless, he "continue[d] to note difficulty with recall which ha[d] been evaluated via neuropsychological testing in the past and attributed to [a] mood disorder." *Id.* Brandon's mood, affect, thought content, and behavior were all normal on that day's exam. R. 604.

      2.    *Medical Opinions*

      William Rutherford, M.D., and Stephen Saxby, Ph.D., reviewed Brandon's records for DDS in March 2020. *See* R. 65–86. Dr. Rutherford opined that Brandon's epilepsy was a "severe" medical impairment, R. 69, and that his "medical history and current treatment" for that disorder indicated that he "ma[]y not be able to safely perform work on high ladders or scaffolds," R. 71. Thus, Dr. Rutherford limited Brandon to work at any exertional level where he "never" needed to climb "ladders/ropes/scaffolds," *id.*, and could "avoid even moderate exposure" to hazards, R. 72. Dr. Saxby opined that Brandon had three "severe" mental impairments—a depressive disorder, an anxiety disorder, and a trauma-related disorder—that caused "mild" limitations overall in his ability to understand, remember, or apply information and "moderate" limitations overall in his abilities to interact with others; concentrate, persist, or maintain pace; and adapt or manage himself. R. 69. He explained that Brandon's "chronic symptoms and medication effects" prevented him from doing "skilled or complex tasks," but the fact that his "cognitive ability [was] generally normal and he remain[ed] able to perform many basic" daily activities on his own indicated that Brandon could "carry out simple 1-step tasks." R. 73. Brandon's "ongoing mood symptoms" ruled out "complex social tasks," but he still could "engage in simple conversation with coworkers or [the] general public." *Id.* Dr. Saxby also opined that Brandon was "not significantly limited" in his abilities to do these tasks "within a schedule, maintain regular attendance, and be punctual within customary tolerances" and "to sustain an ordinary routine without special supervision." *Id.* He did not identify any specific

19

adaptation limitations. R. 74. Richard Surrusco, M.D., and Leslie Montgomery, Ph.D., generally

affirmed these findings after reviewing Brandon's records for DDS in June 2020. *See* R. 80–84.

That September, PA Carter completed a medical-opinion form about Brandon's ability to

do work-related mental activities. R. 582–83. He opined that Brandon had "no useful ability to

function"—i.e., an "extreme limitation" and complete inability to do the activity in a "regular

work setting"—sustaining "attention for two hours segments" and dealing with "normal stress"

typical of "unskilled" work. R. 582. Brandon was "unable to meet competitive standards"—i.e.,

he could not "satisfactorily perform th[e] activity independently, appropriately, effectively and

on a sustained basis in a regular work setting"—when it came to most of the other mental

"abilities and aptitudes needed to do unskilled work," including understanding "very short and

simple instructions," maintaining "regular attendance and be[ing] punctual within customary,

usually strict tolerances," working "at a consistent pace without" taking unreasonable breaks, and

interacting "appropriately with the general public." R. 582–83 (capitalization altered). He was

"seriously limited"—i.e., "less than satisfactory, but not precluded in all circumstances"—in his

abilities to "sustain an ordinary routine without special supervision," to get along with

coworkers, and to respond appropriately to criticism from supervisors. R. 582. Brandon's

abilities to "be aware of normal hazards and take appropriate cautions" and to "adhere to basic

standards of neatness and cleanliness," on the other hand, were "unlimited or very good." R. 582–

83 (capitalization altered). PA Carter based the "serious" to "extreme" limitations on the fact that

Brandon "continue[d] to endorse significant anxiety and depressive symptoms that affect his

cognition and memory," R. 582, as well as his own "evaluation" of Brandon's presentation at

clinic visits, R. 583. PA Carter also explained that "social interaction increases [Brandon's]

anxiety to the point of panic" and a "work environment would exacerbate this to a degree that

20

would limit his ability to remain competitive." R. 583. He opined that Brandon would miss
"more than four days per month" of work because of his impairments or treatment. *Id.*

Mr. Harmon filled out the same form evaluation in December 2020. R. 585–86. His
opinions of Brandon's abilities generally paralleled PA Carter's assessment, although they were
slightly less restrictive in certain categories. *See id.* For example, Mr. Harmon found that
Brandon was "unable to meet competitive standards" in most "abilities and aptitudes needed to
do unskilled work," but he did not find that Brandon had "no useful ability to function" in any
category. *Id.* Mr. Harmon rated Brandon's abilities in most other categories as "seriously limited
but not precluded." *Id.* He explained that those ratings were based on Brandon's "self report" of
his mental status as of December 2020, most notably his "chronic stress and anxiety due to
PTSD" after the August 2018 work accident, R. 586, and Brandon's "several" failed "attempts to
return to work," R. 585. Mr. Harmon agreed Brandon would miss more than four days of work
per month. *Id.*

### 3.   Subjective Statements

Brandon completed an Adult Function Report in March 2020. R. 197–204. In this report,
he stated that "panic attacks affect [him] every day," depression left him "exhausted" and
"unable to think clearly," and PTSD symptoms kept him "reliving the past and nervous." R. 197.
He would "go for days without bathing" or changing his clothes. R. 198. On an ordinary day,
Brandon woke up, took his medications, got his kids up and ready for school, and took his
youngest son to school. R. 197. He also watched TV, made "some frozen dinners," and did
laundry every day. R. 199–200. Betty Jo helped him with the kids, R. 198, as well as their
homework, R. 200. She also had to remind Brandon to take care of his personal needs. R. 199.
Brandon went shopping in stores about "once a week" for 60 to 90 minutes at a time. R. 201; *see*

*also* R. 200. He needed someone to accompany him outside the house. R. 201. Brandon denied "any problems getting along with family, friends, neighbors, or others," but also noted that he was "very anti-social." R. 202; *see also* R. 203 (noting he got along "very well" with authority figures). He alleged that depression, anxiety, and PTSD impaired his memory, concentration, and ability to follow instructions, especially written instructions. R. 202. Brandon estimated that he could pay attention for "2 to 3 minutes" and reported that he did not finish what he started. *Id.* He did not handle stress "well," but he was "not so bad" at handling changes in routine. R. 203.

On January 6, 2021, Brandon testified before ALJ Munday in a telephone hearing. R. 33–62. On a typical day, Brandon would wake up and then "sit with [his] eight-year-old [son] for several hours" while they did "his virtual learning work." R. 40. Brandon's two older children pretty much "handle[d] their own virtual learning," R. 41, and "help[ed] a whole lot with cooking, cleaning, and things like that," R. 40 ("We had to start paying them because I just[] couldn't keep up with it."). *See also* R. 41–42. Brandon "tr[ied] to straighten up the house throughout the day," but sometimes he had to take breaks because he got "a little overwhelmed." R. 40. Brandon's wife worked from home, *id.*, and had "to remind [him] throughout the day of what to do," R. 47. He could bathe his younger son and make "simple food items" for himself and the kids, but his "wife usually helps [him] with dinner." R. 50.

Brandon struggled "to put into words" how his anxiety and depression affected him, noting several times during the hearing that it was "very difficult for [him] to explain" or answer questions. R. 42; *see also* R. 48. He also testified that it was "very hard for [him] to focus on one thing at a time" and he "constantly" thought about "very negative" things like death and dying. R. 43–44. Brandon spent "a lot of time by [him]self with [his] thoughts." R. 48. He no longer ran errands by himself because he did not feel comfortable interacting with new people, even "one-

on-one." R. 46. He had a valid driver's license, but he did not "go out very often" and was not comfortable driving alone. R. 51.

Brandon's wife, Betty Jo, also testified. R. 52–57. She testified that the changes she has witnessed in her husband had been "tremendous" and that even though he always suffered from depression, "he went from being able to function to not being able to function on his own." R. 53. Betty Jo "started working from home two years [earlier]," even before the COVID-19 pandemic, "because it became such an issue that [Brandon] wasn't able to function and take care of the kids just by himself," R. 53. Brandon did "what he can around the house." *Id.* He "helps" their eight-year-old son "with his schoolwork when he's able" and "helps make dinner when he's able." *Id.* "The kids do chores, so they help out," including by making breakfast. *Id.* Brandon did "try to help out with chores when he can." *Id.* When Brandon went "grocery shopping or [did] errands," Betty Jo had "to go with him because sometimes he had a breakdown. Sometimes he ha[d] moments where [she] actually ha[d] to stop him and tell him that everything going on around him is real." *Id.* Brandon also got "overwhelmed" during weekend activities with the kids and Betty Jo had to "take over" so he could go take a nap or "just be away for a little while." R. 54; *see* R. 48 ("[O]n the weekends when my wife is off work we try to do things like" playing volleyball and jumping on the trampoline).

Betty Jo had also noticed changes in Brandon's ability to focus and remember things. R. 54–55. Brandon forgot both "little things," like the fact that they recently watched a movie, and "big things," such as recent family events or outings. *Id.* Brandon struggled with written tasks "because he'll start doing it and then he'll trail off to something else or forget about it and have to kind of read back over what he wrote because he doesn't remember filling things out sometimes." R. 55. Betty Jo "kind of had to hold his hand in that respect." *Id.*

23

*B.*    *The ALJ's Decision*

ALJ Munday summarized much of this evidence in her written decision. *See* R. 15–24.

She first found that Brandon had not performed substantial gainful activity ("SGA") since

September 15, 2019, his alleged disability onset date. *See* R. 14. At step two, she found that

Brandon had the following severe MDIs: depression, anxiety, and PTSD. *Id*. ALJ Munday found

that these were "severe" MDIs because they caused "greater than minimal limitations in

[Brandon's] ability to perform basic work activities," *id.*, which according to the regulations

include "the abilities and aptitudes necessary" to follow "simple instructions," exercise

judgment, respond appropriately to supervision, coworkers, and usual work situations, and deal

with changes in a routine work setting, 20 C.F.R. § 404.1522(b)(3)–(6).

Next, ALJ Munday concluded that Brandon retained the physical RFC to "work at all

exertional levels," but could never climb ladders, ropes, or scaffolds and must avoid all

"exposure to hazardous conditions, including unprotected heights and moving machinery" R. 17;

*see* R. 15. She also found Brandon could do "simple, routine tasks," occasionally interact with

coworkers, but never interact with the public, and could sustain such unskilled "work in a 'low

stress' environment," which she "defined as occasional independent decision making and

occasional workplace changes." *Id.* She did not put any restrictions on Brandon's workplace

attendance or ability to stay on task for eight hours a day, five days a week. *See* R. 18, 21, 24.

As part of her RFC analysis, ALJ Munday found that Brandon's MDIs "could reasonably

be expected to cause [his] alleged symptoms," but that his "statements concerning the intensity,

persistence, and limiting effects of these symptoms [were] not entirely consistent with the

medical evidence and other evidence in the record for the reasons explained" elsewhere in her

decision. R. 21; *see* R. 21–23. First, Brandon's reported problems "maintain[ing] concentration,

remember[ing] simple tasks, and relat[ing] to others . . . [were] not supported by the clinical

exams of record," which showed that Brandon made direct eye contact, exhibited "normal

cooperative behavior," "intact attention and concentration, . . . logical thought process with intact

associations, average intelligence, and normal cognitive function [with] no indication of memory

impairment" despite his "depressed and anxious mood with labile affect." R. 21 (citing R. 386,

418, 430, 457, 564). On the contrary, "[t]hese noted observations suggest[ed]" that Brandon

could "maintain work activity in an environment with limited interpersonal contact where the job

tasks are simple, routine, and low stress." *Id.*; *see also* R. 24 ("[He] is able to maintain intact

cognitive and social function during his treatment visits[.]"). Second, Brandon's "reported

activities indicate[d] that he [was] capable of simple low stress tasks despite his symptoms." R.

22; *see also* R. 24 (concluding the RFC finding was "supported by [Brandon's] acknowledged

daily activities"). ALJ Munday found Brandon had "acknowledged" in his testimony that he was

"an active participant in his children's homeschooling" and reported that he could "maintain[]

attention and concentration for simple household tasks" like making "simple" meals and doing

laundry. R. 22. He also drove, paid bills, went grocery shopping, and got along with authority

figures. *Id.* (citing R. 197–204). Third, "[c]ontrary to his testimony," Brandon had "denied

recurrent panic attacks when seeing his treating clinicians." *Id.* (citing R. 385, 388). Finally, "the

record suggest[ed]" that Brandon's allegedly disabling "symptoms [were] manageable" when he

took his medication as prescribed. R. 22; *see also* R. 24 ("[H]e has responded well to therapy and

medication management, especially when he is compliant."). He reported that he "responded

well to Vraylar and Spravato." R. 22 (citing R. 415, 602). When Brandon did "report[] increased

symptoms, it [was] usually in response to external stressors or after stopping his prescribed

medications." *Id.* (citing R. 304, 382, 561–62).

Next, ALJ Munday evaluated the medical-opinion evidence in Brandon's record. *See* R. 22–24. She found the DDS psychologists' opinions that Brandon could "carry out simple one-step tasks [and] engage in simple conversations with coworkers and the general public," R. 24 (citing R. 73, 83), to be "generally persuasive" because they were "supported by" Brandon's "acknowledged daily activities and his unremarkable cognitive exams" and "consistent with [cited] treatment notes" showing Brandon routinely exhibited "labile affect and depressed and anxious mood," *id.* (citing R. 386, 418, 430, 457, 564). She rejected the DDS psychologists' opinions that Brandon could handle some public interaction because his "hearing testimony . . . indicated [he had] severe socialization limitations, especially in crowded spaces." *Id.* Thus, ALJ Munday "further limited [Brandon] to no socialization with the general public." *Id.*; *see* R. 17.

ALJ Munday found that neither Mr. Harmon's nor PA Carter's opinions were "particularly persuasive," R. 22, in crafting Brandon's mental RFC. Regarding Mr. Harmon's assessment, ALJ Munday found that the restrictions Mr. Harmon identified were "not well supported by [his own] treatment notes" and appeared to "be based primarily on [Brandon's] subjective reports." R. 23 (citing R. 585–86). During his initial visit with Mr. Harmon in March 2019, for example, Brandon "generally demonstrated intact cognitive and social functioning despite his depressed mood and anxiety." *Id.* (citing R. 457). ALJ Munday also found Mr. Harmon's restrictive functional assessment, R. 585–86 (Dec. 2020), was "inconsistent with" his prior statements indicating that Brandon "could return to full-time work without restrictions" in late 2019, R. 23 (citing R. 478–79, 481, 489–91).

Regarding PA Carter's assessment, ALJ Munday found his opinion that Brandon would be "absent [from work] more than four days each month [was] inconsistent with the level of limitation that [PA Carter] assigned to" other work-related functional areas, which indicated

Brandon was "only seriously limited, satisfactory, or unlimited." R. 24 (citing R. 582–83). She also noted that PA Carter "routinely" noted "normal" findings on Brandon's mental-status exams "in spite of [Brandon's] depressed and anxious mood," *id.* (citing R. 386, 418, 430, 564), but she did not explain how that evidence made PA Carter's opinion any more or less persuasive. *See id.* ALJ Munday concluded, "Due to the lack of support and inconsistency with the treatment record, [she] found Mr. Carter's assessment to be generally unpersuasive." *Id.* Nonetheless, her RFC finding is consistent with PA Carter's opinion that Brandon had very serious or extreme limitations interacting with the public and dealing with "normal stress" typical of "unskilled" work, R. 582. *See* R. 17.

C.    *Discussion*

Brandon's arguments challenge ALJ Munday's mental RFC findings. A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his medical impairments and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities" on that basis, SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015).

1.    *Medical Opinions*

Brandon first argues that ALJ Munday erred in failing to properly analyze PA Carter's and Mr. Harmon's medical opinions. "Medical opinions"—i.e., statements from a medical source about what the claimant "can still do despite" his MDIs and whether he has "impairment-related

limitations or restrictions" in meeting specific physical, mental, or environmental demands of work, 20 C.F.R. § 404.1513(a)(2), can be critical to a proper RFC analysis. *See, e.g.*, *Woods v. Berryhill*, 886 F.3d 686, 695 (4th Cir. 2018). For DIB claims filed after March 27, 2017, ALJs must "articulate in [the] . . . decision how persuasive [they] find all of the medical opinions" in the claimant's record to be, 20 C.F.R. § 404.1520c(b), using the relevant factors listed in the regulations, "as appropriate," *id.* § 404.1520c(a). "[S]upportability and consistency are the most important factors [ALJs] consider when [they] determine how persuasive [they find] a medical source's medical opinion . . . to be." *Id.* § 404.1520c(b)(2) (cleaned up). ALJs therefore "will explain how [they] considered" those two specific factors when evaluating a medical source's medical opinion. *Id.* "Supportability" looks at the "objective medical evidence and supporting explanations presented by a medical source . . . to support his or her [own] medical opinion(s)[.]" *See id.* § 404.1520c(c)(1). The "more relevant" the evidence and explanations "presented by a medical source are to support his or her medical opinion(s), the more persuasive" those opinions will be. *Id.* "Consistency," on the other hand, compares the medical opinion to other relevant evidence in the claimant's record. *See id.* § 404.1520c(c)(2). "The more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the [record], the more persuasive the medical opinion(s) . . . will be." *Id.* ALJs "may, but [generally] are not required to, explain how [they] considered" other regulatory factors, *id.*, such as the source's medical specialty, familiarity with the record, or treating relationship with the claimant. *See id.* § 404.1520c(b)(3).

This regulation is more flexible than its prior version, which required ALJs to evaluate "treating source" medical opinions under a special two-part standard to determine if they were entitled to "controlling weight" and to explicitly consider each of five regulatory factors when

assigning specific weights to every medical opinion in the claimant's record. *See, e.g.*, *Dowling v. Comm'r of Soc. Sec.*, 986 F.3d 377, 384–85 (4th Cir. 2021) (citing 20 C.F.R. § 404.1527(c) (2016)); *Testamark v. Berryhill*, 736 F. App'x 395, 398 (4th Cir. 2018) (citing 20 C.F.R. §§ 404.1527(c), 416.927(c) (2016)); 20 C.F.R. § 404.1520c(a)(2017) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . including those from your medical sources."). Even under the new regulation, an ALJ "cannot reject an examining or treating [source's] opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022). Fundamental principles of judicial review also still apply. "[A] proper RFC analysis," for example, "has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). "The second component, the ALJ's logical explanation" of how she weighed relevant evidence, such as medical opinions, and arrived at her RFC findings, "is just as important as the other two." *Id.* "This requires the ALJ to 'present [the court] with findings and determinations sufficiently articulated to permit meaningful judicial review.'" *Testamark*, 726 F. App'x at 399 (quoting *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983)). When the court is "'left to guess' as to how the ALJ reached her evaluation of the conflicting medical opinions in light of the evidence of record," then it cannot "review the reasonableness of her conclusions," *id.* (quoting *Mascio*, 780 F.3d at 638), to ensure "the ALJ's decision is supported as a matter of fact and law," *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018). *See, e.g.*, *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020) ("[E]ven under this deferential standard, we do not reflexively rubber-stamp an ALJ's findings. To pass muster, ALJs must build an accurate and logical bridge from the evidence to their conclusions." (cleaned up)).

ALJ Munday's decision does not satisfy this "deferential standard of review," *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015). First, she did not "articulate *how* [she] considered the supportability and inconsistency factors," *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01 (Jan. 18, 2017) (emphasis added) ("*Revisions to Rules*"), in finding that PA Carter's opinion was "generally unpersuasive," R. 24. She simply concluded the opinion was unpersuasive "[d]ue to [its] lack of support and inconsistency with the treatment record," R. 24, without citing any specific "inconsistent" evidence or otherwise explaining that conclusion. This failure to explain is reversible legal error. *See Hardy v. Comm'r of Soc. Sec.*, No. 20-10918, 2021 WL 3702170, at *1 (E.D. Mich. Aug. 13, 2021); *cf. Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 661 (4th Cir. 2017) (concluding that a regulation which "states the SSA *will* document application of the [special] technique in the decision" imposed mandatory duty of written explanation in evaluating mental impairments and explaining that an ALJ's "failure to properly document application of the special technique will rarely, if ever, be harmless because such a failure prevents, or at least substantially hinders, judicial review"); *Monroe v. Colvin*, 826 F.3d 176, 191 (4th Cir. 2016) (ALJ's conclusory statement that "the objective evidence or the claimant's treatment history did not support the consultative examiner's findings," without specific citations to the record, precluded meaningful review).

Second, ALJ Munday did not logically explain why she concluded that PA Carter's opinion that Brandon would miss at least four days of work a month, R. 583, was "inconsistent with" the provider's other opinions that Brandon was "only seriously limited, satisfactory, or unlimited," R. 24, in his abilities to do specific job-related functions like getting "along with coworkers or peers without unduly distracting them," R. 23, adhering to "basic standards of neatness," and taking "appropriate cautions" around workplace hazards, R. 582–83. *See Woods*,

30

888 F.3d at 694 ("[T]he ALJ must *both* identify evidence that supports his conclusion *and* build

an accurate and logical bridge from that evidence to his conclusion." (cleaned up)). The fact that

Brandon can avoid hazards once he gets to work "has nothing to do with," *Mascio*, 780 F.3d at

639, whether his psychiatric symptoms and treatment would require him to miss "more than four

days" of work a month, R. 583. Moreover, this aspect of PA Carter's assessment tracks both his

own and Mr. Harmon's opinions that Brandon was "unable to meet competitive standards" when

it came to maintaining "regular attendance and be[ing] punctual within customary, usual strict

tolerances," R. 583, 585. *See* 20 C.F.R. § 404.1520c(c)(2). It also appears consistent with PA

Carter's note from August 2020 that Brandon was an ideal candidate for Spravato therapy in part

because he was "no[t] working and therefore [they would] not have to worry about him missing

work for this treatment as the time commitments are significant, especially early on in the

treatment," R. 571. *See* 20 C.F.R. § 404.1520c(c)(2). ALJ Munday's failure to acknowledge, let

alone explain how she reconciled, evidence that directly undermines her apparent rationale for

discounting PA Carter's opinion precludes meaningful judicial review. *See Golembiewski v.

Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (explaining that an "ALJ need not discuss every

piece of evidence in the record," but she "must evaluate the record fairly" and "may not ignore

an entire line of evidence that is contrary to the ruling" because "[o]therwise it is impossible for

a reviewing court to tell whether the ALJ's decision rests upon substantial evidence" in the

record as a whole).

  *2.    Brandon's Symptoms*

  Brandon's other challenge to ALJ Munday's RFC assessment is that she erred in failing

to properly analyze his and his wife's credibility regarding his symptoms resulting from his

severe impairments. The regulations set out a two-step process for evaluating claimants'

31

symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529. "First, the ALJ looks for objective

medical evidence showing a condition that could reasonably produce the alleged symptoms,"

*Lewis*, 858 F.3d at 866, "in the amount and degree[] alleged by the claimant," *Craig v. Chater*,

76 F.3d 585, 594 (4th Cir. 1996). Second, assuming the claimant clears the first step, "the ALJ

must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to

determine the extent to which they limit the claimant's ability," *Lewis* 858 F.3d at 866, to work

on a regular and continuing basis, *Mascio*, 780 F.3d at 637; *Hines*, 453 F.3d at 565. "The second

step requires the ALJ to assess the credibility of [subjective] statements about symptoms and

their functional effects," *Lewis* 858 F.3d at 866, after considering all relevant evidence in the

record, 20 C.F.R. § 404.1529(c). The ALJ must give specific reasons, supported by "references

to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No.

4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL

374186, at *2, *4–5 (July 2, 1996)). A reviewing court will uphold the ALJ's credibility

determination if his or her articulated rationale is legally adequate and supported by substantial

evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014)

(citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)); *Hines*, 453 F.3d at 565–66.

Here, ALJ Munday found that Brandon's severe anxiety, depression, and PTSD "could

reasonably be expected to cause [his] alleged symptoms," *see* R. 14, 21, including "daily" panic

attacks, social anxiety in crowds, chronic depression, exhaustion, difficulty focusing and staying

on task, forgetfulness, "racing" and "obsessive" negative thoughts, being "anti-social" or

isolating himself, decreased motivation, and being easily overwhelmed, R. 17–18 (citing R. 197–

204, testimony). She also summarized Brandon's reports that he did "simple household chores"

like making "simple meals" and laundry; Brandon's testimony that he "assists" his children with

their virtual learning "but he takes breaks and his oldest [son] helps him"; and Betty Jo's

testimony that "she had to start working from home two years ago to help [Brandon] with

childcare" and that Brandon "no longer ran errands" alone. R. 18. While ALJ Munday explicitly

credited some of Brandon's allegations by restricting him to "low stress" unskilled work, R. 22,

and "no socialization with the general public," R. 24; *see also* R. 18, she gave four reasons why

Brandon's statements describing more extreme, continuous symptoms and limitations were "not

entirely consistent with the medical evidence and other evidence in the record," R. 21. *See* R.

21–22. None of those reasons (alone or combined) logically support ALJ Munday's conclusion

that Brandon's symptoms did not prevent him from working eight hours a day, five days a week

in a competitive work environment. *See Thomas*, 916 F.3d at 311.

First, ALJ Munday relied on a progress note from April 30, 2013—more than six years

before Brandon's alleged disability onset date—in finding that Brandon "denied recurrent panic

attacks when seeing his treating clinicians," R. 22 (citing R. 385, 388), and that those denials

were "[c]ontrary to" Brandon's testimony in March 2020 and January 2021, *id.*, that he suffered

"daily" panic attacks, *see* R. 17–18 (citing R. 197, testimony). Substantial evidence does not

support the ALJ's finding on this point "because the record when read as a whole, reveals no

inconsistency between," *Hines*, 453 F.3d at 565, Brandon's report in April 2013 that he "used to

have panic attacks, do[es] not get these anymore," R. 385, 388, and his testimony many years

later—after two traumatic accidents—that he was having panic attacks again, R. 197 (Mar.

2020). Moreover, Brandon often told providers that he had recurrent, if not "daily," anxiety or

panic attacks beginning in January 2019. *See, e.g.*, R. 375, 379, 382 (Apr. 2019); R. 355, 386

(Jan. 2019); R. 432 (Dec. 2019); R. 457 (Mar. 2020); R. 475 (Sept. 2019); R. 567 (Aug. 2020).

ALJ Munday did not explain how she considered those reports in concluding that Brandon's

testimony describing recurrent panic attacks during the relevant time was "inconsistent" or "contrary to" other evidence in his record, R. 21–22. *See Hancock v. Barnhart*, 206 F. Supp. 2d 757, 764 (W.D. Va. 2002) ("A district court will no[t] . . . revisit the ALJ's resolution of conflicting evidence. However, if the ALJ appears, without stating a reason, to have credited some probative evidence over other evidence or to have ignored evidence altogether, a remand or reversal may be necessary.").

ALJ Munday's findings that Brandon's "symptoms [were] manageable" when he took his medications as directed and that his reports of "increased symptoms [were] usually in response to increased external stressors or after stopping his prescribed medications," R. 22 (citing R. 304, 382, 561–62), fail for similar reasons. While Brandon did report extreme anxiety and depression the few times he stopped his medications, R. 304 (Jan. 2019); R. 384 (Apr. 2019); R. 561 (July 2020); he frequently reported comparable symptoms despite taking multiple psychotropic drugs as directed, *see, e.g.*, R. 325, 354, 385–86 (Jan. 2019); R. 375 (May 2019); R. 475 (Sept. 2019); R. 389–91 (Nov. 2019); R. 421–25, 427–32 (Dec. 2019); R. 392–95, 404–09 (Jan. 2020); R. 410–14 , 415–19 (Feb. 2020); R. 567–71 (Aug. 2020). Providers repeatedly increased, changed, or added medications "to better manage," R. 379, Brandon's generalized anxiety, panic attacks, severe depression, and visual hallucinations. *See, e.g.*, R. 355, 375–76, 380, 382, 387, 391, 404, 414, 425, 427, 459, 566, 571. While Brandon occasionally reported some benefit from certain medications, *see, e.g.*, R. 340, 379, 421, that benefit was generally short lived or related to only one or two of his allegedly disabling symptoms. In April 2019, for example, Brandon reported that 40 mg of Prozac helped his mood swings, but that he still experienced "daily panic attacks" and "poor" motivation/energy. R. 379; *see also* R. 386 (Nov. 2019); R. 427 (Dec. 2019). That December, he told PA Carter that adding 1.5 mg Vraylar had "significantly reduced" his

hallucinations, but "there ha[d] not been any significant improvement in his mood," R. 421, since

switching from 80 mg Prozac to 10 mg Trintellix, R. 428. More often than not, however, he

reported persistent anxiety, depression, memory loss, self-isolation, disassociation, visual

disturbances, fatigue, and/or irritability despite taking his medications as prescribed. *See, e.g.*, R.

325–26, 337, 345–46, 354, 375, 385–86, 389, 392, 397, 413–15, 419, 427, 432, 459–75, 477,

479–80, 483, 486, 488, 496, 499, 505–06, 553, 555, 561. In December 2019, PA Carter opined

that Brandon "would be an ideal candidate" for new Spravato therapy because, considering his

"multiple medication failures" and failed ECT years earlier, he "certainly [met] criteria for a

treatment resistant depression." R. 427; *see also* R. 449 (Mar. 2020); R. 571 (Aug. 2020).

Brandon was finally able to start bi-monthly Spravato therapy sometime between August and

October 2020—at least twelve months after his alleged disability onset date. *See* R. 602. On

October 9, Brandon reported that "Spravato ha[d] helped greatly" and his "mood [was] doing

much better" than a year earlier. *Id.* Nonetheless, he "continue[d] to note difficulty with recall

which ha[d] been evaluated via neuropsychological testing in the past and attributed to [a] mood

disorder." *Id.*

     ALJ Munday did not explain how she considered *any* of this evidence in finding that

Brandon's "symptoms [were] manageable" on medication and that his reports of "increased

symptoms [were] usually in response to increased external stressors or after stopping his

prescribed medications," R. 22 (citing R. 304, 382, 561–62). *See Lewis*, 858 F.3d at 869 ("An

ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick

facts that support a finding of nondisability while ignoring evidence that points to a disability

finding."). Further, by relying on just three treatment notes—two of which predate Brandon's

alleged onset date—to discredit Brandon's statements describing significant, ongoing mental-

health symptoms, "the ALJ's opinion seizes on insignificant inconsistences in the treatment record while overlooking the record's broader import." *Testamark*, 736 F. App'x at 399. As in *Testamark*, Brandon's "medical record reveals a steady decline in [his] mental health," which providers "attempted to treat with a multifaceted of psychiatric medication" intended to target specific symptoms, 736 F. App'x at 399. That "increasingly aggressive clinical treatment," *id.*, finally led them to Spravato for "treatment-resistant depression," R. 427, 571. That new drug helped Brandon's mood, but it did not help his reported anxiety and memory impairment. *See* R. 602. "In the face of this record, the ALJ's reliance on sparse observations from dated treatment notes does not support her conclusion," *Testamark*, 736 F. App'x at 399, that Brandon's symptoms were not as severe as he and his wife alleged, R. 17–18, 21–22.

Third, ALJ Munday found that Brandon's "acknowledged daily activities," R. 18, or "own reported activities," R. 22, both undercut Brandon's alleged inability to "sustain unskilled work tasks, relate to others, and cope with stress in a work setting," R. 18, and supported her own conclusion that he could do "simple low stress tasks despite his symptoms," R. 22. For example, she found that Brandon was "an active participant in his children's homeschooling" and could sustain "attention and concentration for simple household tasks" like making "simple meals" and doing laundry. R. 22; *see also* R. 15–16. But, ALJ Munday "did not acknowledge the limited extent of those activities as described by [Brandon and his wife] or explain how those activities showed that [Brandon] could sustain a full-time job" outside the home. *Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 269 (4th Cir. 2017).

Brandon testified that he "participates" in his children's homeschooling by sitting with the youngest child while he did virtual schoolwork. R. 40. His two older children were self-sufficient and "handle[d] their own virtual learning." R. 41. Brandon "tr[ied] to straighten up the

36

house throughout the day," but he had to take breaks because he got "a little overwhelmed." R.
40; *see also* R. 53. His wife had to start working at home and the older kids "help[ed] a whole lot
with cooking, cleaning, and things like that" because Brandon "couldn't keep up with it" on his
own. *Id.*; *see also* R. 53. Betty Jo had to remind Brandon to do simple household tasks during the
day, R. 40, 53, 199, and she had to "take over" family activities with the kids because Brandon
got "overwhelmed" and needed to "just be away for a little while," R. 54. Both Brandon and
Betty Jo testified that Brandon did not leave the house alone, R. 46, because there were times he
would "breakdown" and Betty Jo had to tell him "that everything going on around him is real,"
R. 53; *accord* R. 325, 386, 561, 565 (reporting the same). "An ALJ may not consider the *type* of
activities a claimant can perform without also considering the *extent* to which []he can perform
them. The ALJ here did just that." *Woods*, 888 F.3d at 694. Even if ALJ Munday fairly
characterized some of Brandon's activities—e.g., by recognizing that he could make "simple"
meals and do "simple" household tasks—she did not explain how those basic activities,
performed on Brandon's own time and at his own pace, supported her conclusion that Brandon
could sustain a full-time job outside the home. *See Brown*, 873 F.3d at 269–70. These are clear
legal errors. *See id.*

Finally, ALJ Munday did not explain how she concluded that the mixed findings on
Brandon's mental-status exams—which documented his "depressed and anxious mood with
labile affect," but were otherwise generally normal—showed that Brandon "in fact[] would be
able to maintain work activity in an environment with limited interpersonal contact where the job
tasks are simple, routine, and low stress," R. 21 (citing R. 386, 418, 430, 457, 564). *Cf. Woods*,
888 F.3d at 694 ("The ALJ concluded that Woods could perform 'medium work' and
summarized evidence that he found credible, useful, and consistent. But the ALJ never explained

how he concluded—*based on this evidence*—that Woods could actually perform the tasks required by medium work[.]'"). She "therefore failed to build an accurate and logical bridge from the evidence [s]he recounted to [her] conclusion about" Brandon's RFC. *Id.*

Moreover, "[b]ecause symptoms of mental illness may wax and wane over the course of treatment, the fact that [Brandon] exhibited fair judgment or appeared cooperative on certain specific occasions is not inconsistent with the conclusion that []he is unable to work" full-time. *Testamark*, 736 F. App'x at 398–99; *see* R. 24 ("[He] is able to maintain intact cognitive and social function during his treatment visits[.]"). Indeed, both PA Carter and Mr. Harmon opined that Brandon's severe mental illness caused numerous work-preclusive limitations despite their generally unremarkable findings on his mental-status exams. *Cf. Thompson v. Berryhill*, No. 4:18cv133, 2019 WL 2980030, at *12 (E.D.N.C. Apr. 22, 2019) ("In general, a psychiatrist . . . has more leeway in relying on the subjective statements of a patient than a provider dealing with physical conditions."). ALJ Munday also overlooked those instances where Brandon had "impaired" cognition and memory, R. 347, and was "tearful," and "irritable," R. 355, 339, 394–95, 418, 424, 430, 564, 571, or "overwhelmed" on exam, R. 571. Again, an "ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis*, 858 F.3d at 869. ALJ Munday needed to explain how she considered these abnormal exam findings in evaluating Brandon's RFC. Her failure to do so is reversible legal error. *See id.*

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Brandon's Motion for Summary Judgment, ECF No. 15; **DENY** the Commissioner's Motion, ECF No. 17; **REVERSE** the Commissioner's final decision denying Brandon's DIB

claim; **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g); and **DISMISS** this

case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations

within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is

directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel

of record.

ENTER: December 12, 2022

Joel C. Hoppe
United States Magistrate Judge